# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| AMERICA'S COLLECTIBLES NETWORK, INC., D/B/A/ JEWELRY TELEVISION, | ) ) | No. 3:09-cv-00143 |
| *Plaintiff*, | ) | Judge Travis R. McDonough |
| v. | ) ) | |
| STERLING COMMERCE (AMERICA), INC., | ) | |
| *Defendant.* | ) | |

## PLAINTIFF'S BRIEF IN SUPPORT OF AN EQUITABLE PREJUDGMENT INTEREST RATE AS SPECIFIED IN THIS COURT'S DECEMBER 10, 2020 ORDER

In response to this Court's December 10, 2020 Order ("12/10/20 Order") (Dkt. 938), America's Collectibles Network, Inc., d/b/a Jewelry Television ("JTV") respectfully submits this brief and cited evidence[1] in support of its suggested 10%[2] equitable rate of prejudgment interest in conformance with *America's Collectibles Network, Inc. v. Sterling Commerce (America), Inc.*, 819 F. App'x 397 (6th Cir. 2020) [hereinafter *Sterling II*].[3] In 2017, JTV prevailed at trial against Sterling Commerce (America), Inc. ("Sterling") on its claims for fraud, negligent misrepresentations, and breaches of contract, and was awarded $13 million for each claim. The jury rejected each of Sterling's affirmative defenses, and Sterling dismissed its seven meritless

---

[1] Docket entries ("Dkt."), trial exhibits, and witness testimony cited herein are incorporated hereto as though set forth in full. For the Court's reference, Trial Exhibits are included in Appendix 1, and unpublished opinions are included in Appendix 2.

[2] JTV has always maintained that 10% is the appropriate interest rate under Tennessee law and has not waived that claim. Dkt. 870 at 2. In *Sterling II*, JTV supported this Court's interest rate determination of 5.4%, but JTV's briefing has been clear that 10% is proper because Sterling's conduct "brought JTV to its knees during the Great Recession" and "stunted its future growth." Dkt. 850 at 17; *see also* Dkt. 865 at 29 ("any judgment should also include an award of prejudgment interest at a rate up to 10 percent" to "fully compensate [JTV] for the loss of the use of its funds"). Clear trial testimony demonstrated that Sterling's failure to deliver the software as promised crippled JTV's ability to weather the recession, causing additional damages. *See, e.g.,* Dkt. 899 at 154 (JTV "got hurt a lot worse than everybody else" during the recession due to Sterling's failed implementation), 158, 230-35 (JTV continued to pay Sterling even though the economic climate was brutal); Dkt. 901 at 91-92, 102-03 (Sterling's failure deprived JTV of the "tools" necessary to "deal with the recession"), 104-06 (JTV "performed substantially below" its peers during the recession due to the lack of systems promised by Sterling).

[3] The 12/10/20 Order allows JTV to revisit the record to support a prejudgment interest rate in accordance with Tennessee law. *Sterling II* likewise gives this Court the flexibility to use that information to decide a rate unconstrained by its earlier prejudgment interest awards.

counterclaims during trial. Though the Court found that damages overlapped, the jury verdict is conclusive: JTV was the victim of fraud, negligent misrepresentations, and breach of contract that left JTV without $53 million in promised benefits but over $10 million of forced expenditures on the Sterling software, depleting its resources during the recession. Accordingly, to fully compensate JTV's damages, equity warrants that the Court award JTV the maximum prejudgment interest rate allowed under Tennessee law.

A 10% award is supported by the record and well-established authority, including the Tennessee Supreme Court's decision in *Myint v. Allstate Insurance Co.* and the recent decision of the Tennessee Court of Appeals at Knoxville in *Coffey v. Coffey*.[4] No equitable grounds in this matter weigh in favor of the Court awarding a lower rate. The record demonstrates that Sterling's wrongful conduct denied JTV the use of its funds, that this denial resulted in losses to JTV in excess of the 10% permitted rate, that JTV promptly pursued its interests, that JTV did not engage in abusive or dilatory litigation practices, and that JTV was not otherwise compensated for the lost time value of its money. Additionally, there were no "unusual or extraordinary" court-caused delays; rather, the Court's time to rule on motions reflects the volume of the parties' briefings on the motions and related issues, as is typical in complex cases. Now, Sterling attempts to argue that a 10% interest rate is too high although it and IBM have agreed to and benefitted from interest rates over 10% during the pendency of this lawsuit. Based on applicable authority and the record, a prejudgment interest award of 10% is equitable to all parties and necessary to fully compensate JTV for the loss of use of funds to which it was legally entitled.

---

[4] *Myint v. Allstate Ins. Co,.* 970 S.W.2d 920 (Tenn. 1998); *Coffey v. Coffey*, No. E2020-001570COA-R3-CV, 2020 WL 6277433 (Tenn. Ct. App. Oct. 26, 2020) (affirming the trial court's award of prejudgment interest at 10% for over 23 years).

2

# I. <u>TENNESSEE LAW ON PREJUDGMENT INTEREST</u>

## A. **Tennessee Law Requires that Prejudgment Interest Fully Compensate JTV.**

In *Sterling II*, the Sixth Circuit summarized Tennessee law on prejudgment interest and primarily relied upon Tenn. Code Ann. §47-14-123 and the Tennessee Supreme Court's decision in *Myint*. The first step in determining prejudgment interest in Tennessee is Tenn. Code Ann. § 47-14-123, which provides in pertinent part:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages … may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum….

The Tennessee Supreme Court substantially rewrote Tennessee's law on prejudgment interest. Utilizing Tenn. Code Ann. § 47-14-123 as the starting point, *Myint* expressly de-emphasized the two principal reasons previously used by Tennessee courts to deny prejudgment interest—certainty as to the amount due and reasonable disputes as to liability. *See* 970 S.W.2d at 927. Instead, the Court redefined the guiding principles to be applied:

> Several principles guide trial courts in exercising their discretion to award or deny prejudgment interest. Foremost are the principles of equity. Tenn. Code Ann. § 47-14-123. Simply stated, the court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing.

*Id.* In explaining the change, the *Myint* court emphasized that "the focus on whether the defendant had a reasonable defense ignores the principle that prejudgment interest is not a penalty imposed on the defendant for indefensible conduct." *Id.* Instead, the interest is, as stated by the statute, "in the nature of damages" and to "fully compensate a plaintiff for loss of use of funds to which he or

3

she was legally entitled.…" *Id.* The importance of fully compensating the plaintiff was reinforced when the Tennessee Supreme Court reinstated the trial court's 10% prejudgment interest award. *Id.* at 929. The Court in *Myint* recognized that the fire insurance claim litigated in that lawsuit was reasonably disputed, noting suspicious circumstances surrounding the policy itself, deteriorating conditions of the property, and evidence of arson. *Id.* at 928. But the *Myint* court nonetheless emphasized that the most important factor in determining the 10% rate was the plaintiff's loss of use of the judgment amount and defendant's full use of the same. The *Myint* court determined that the plaintiffs were legally entitled to the insurance proceeds and that they would not be *fully* compensated without the award of interest. *Id.* at 927.

Similar factors are at play here. The jury found that Sterling defrauded JTV, committed negligent misrepresentations and breached its contracts with JTV. The jury awarded benefit-of-the-bargain damages to JTV of $13 million for each of the two torts, and $13 million in reliance damages for the breaches of contract. <u>Dkt. 814</u>. This Court determined, however, that due to possibly overlapping damages, JTV was entitled to only one $13 million award, and the judgment was limited to that amount. <u>Dkt. 868</u>. JTV has been without use of the $13 million, including over $10 million[5] spent on the failed Sterling project through a date prior to the filing of the complaint.

The Tennessee Court of Appeals has subsequently reinforced that, under the *Myint* analysis, fairness almost always requires full compensation to the plaintiff for the loss of use of the plaintiff's money. In *Scholz v. S.B. International, Inc.*, 40 S.W.3d 78, 83 (Tenn. Ct. App. 2000) (perm. app. denied Mar. 5, 2001), the court analyzed *Myint* as follows:

> As we construe the *Myint* decision, the Tennessee Supreme Court has shifted the balance to favor awarding prejudgment interest whenever doing so will more fully

---

[5] This is included in categories 1 and 2 of out-of-pocket expenses as summarized by Expert Scott Bayley. *See* footnote 9, *infra*.

compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received.

The *Scholz* court then explained when prejudgment interest may be "inappropriate" such as:

(1) when the party seeking prejudgment interest has been so inexcusably dilatory in pursuing a claim that consideration of a claim based on loss of use of the money would have little weight; (2) when the party seeking prejudgment interest has unreasonably delayed the proceedings after suit was filed; or (3) when the party seeking prejudgment interest has already been otherwise compensated for the lost time value of its money.

*Id.* As described herein, none of these factors applies to JTV or suggests an award reduction.

Both the Sixth Circuit in *Sterling II* and this Court in its 12/10/20 Order quoted from the decision in *Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771 (Tenn. Ct. App. 2010), to summarize equitable factors appropriate for consideration:

(1) promptness in the commencement of a claim, (2) unreasonable delay of the proceedings by either party, (3) abusive litigation practices by either party, (4) the certainty of the existence of an underlying obligation, (4) the certainty of the amount in dispute, and (5) prior compensation for the lost time value of the plaintiff's money.

Dkt. 938 at 2. As described below, these factors merit an award of 10% prejudgment interest for JTV. Following these authorities, Tennessee courts routinely award 10% prejudgment interest.[6]

---

[6] *Loans Yes v. Kroger Ltd. P'ship I*, No. M2019-01506-COA-R3-CV, 2020 WL 6386884 (Tenn. Ct. App. Oct. 30, 2020); *Coffey v. Coffey*, 2020 WL 6277433; *Nesmith v. Clemmons*, No. M2019-02521-COA-R3-CV, 2019 WL 5847286 (Tenn. Ct. App. Nov. 7, 2019); *Mathews Constr., Inc. v. Omanwa*, No. E2019-00168-COA-R3-CV, 2019 WL 5309061 (Tenn. Ct. App. Oct. 21, 2019); *Raleigh Commons, Inc. v. SWH, LLC*, 580 S.W.3d 121 (Tenn. Ct. App. 2018); *Premier Imaging/Med. Sys., Inc. v. Coffey Family Med. Clinic, P. C.*, No. E2017-02186-COA-R3-CV, 2018 WL 3361067 (Tenn. Ct. App. July 10, 2018); *Burge v. Farmers Mutual of Tenn.*, No. M2016-01604-COA-R3-CV, 2017 WL 1372864 (Tenn. Ct. App. Apr. 13, 2017); *Raines Brothers, Inc. v. Chitwood*, No. E2015-01430-COA-R3-CV, 2016 WL 3090902 (Tenn. Ct. App., May 24, 2016); *Anil Constr., Inc. v. McCollum*, No. W2014-01979-COA-R3-CV, 2015 WL 4274109 (Tenn. Ct. App. July 15, 2015); *Bakers Constr. Serv., Inc. v. Greenville-Greene Cnty. Airport Auth.*, No. E2014-01395-COA-R3-CV, 2015 WL 2258423 (Tenn. Ct. App. May 14, 2015); *Thornton v. Massey*, No. W2013-01022-COA-R3-CV, 2014 WL 2472206 (Tenn. Ct. App. May 30, 2014).

5

Similarly, federal courts have awarded or affirmed 10% under Tennessee law as well.[7] The same result should be reached in this matter.

## B. An Award Using a Prevailing Market Interest Rate is Not Proper or Equitable.

Sterling originally argued that this Court should look to prevailing market rates for an award of prejudgment interest (Dkt. 854 at 23). However, Sterling then switched positions and argued to this Court that it should only focus on the enumerated factors under Tennessee state authority, which do not include prevailing market interest rates. Dkt. 937 at 4. JTV does not necessarily agree that market interest rates can never be considered; rather, JTV agrees that market interest rates are not a proper guide here as they vastly underestimate the value of capital to JTV during the great recession and the prolonged recovery, thus not "fully compensating" JTV for its lost use of funds. JTV's damages from its loss of use of the $13 million judgment amount are more appropriately assessed based on the undisputed evidence that *credit to JTV was unavailable* (even at 10%) to replace the capital that this judgment represented.

Even if JTV's defaulted credit facility had allowed it to borrow the lost $13 million, which it did not (*see e.g.* D-37), JTV's borrowing rates exceeded the prime rate during the applicable time period. *See* Dkt. 854-1 at 2-3 (affidavit from IBM's expert witness affirming that JTV's interest rates were up to 5.5% with costs higher than the prime interest rate); J-157 at 6 (rates of 4.25%, 5.25%, and 6.65%); J-303 at 14 (rates of 6.65%, 6.77%, and prime+2%); J-169 at 16 (rates of prime+1.25% to 1.75%); *see also* D-37, D-40.

JTV does acknowledge that some federal courts applying Tennessee law have examined

---

[7] *See*, *e.g.*, *FLSmidth Inc. v. Fiber Innovation Tech. Inc.*, 626 F. App'x 625, 630 (6th Cir. 2015); *Baptist Physician Hosp. Org., Inc. v. Humana Military Healthcare Servs., Inc.*, 481 F.3d 337 (6th Cir. 2007); *Reed v. Cracker Barrel Old Country Store, Inc.*, 171 F. Supp. 2d 751, 768 (M.D. Tenn. 2001).

6

this factor in certain situations. In those opinions, the courts' focus was on the reasonable rate of return on the money plaintiffs were entitled to use (e.g., invested or saved). *See Williams v. Shelby*, No. 2:17-cv-02050-TLP-JAY, 2020 WL 7061763, at *2-3 (W.D. Tenn. Dec. 2, 2020) (awarding 5% based on the prevailing market interest rate to compensate wrongfully discharged plaintiff for lost salary); *MAKS, Inc. Gen Trading & Contracting Co. v. Sterling Operations, Inc.*, No. 3:10-CV-443, 2014 WL 297291, at *1 (E.D. Tenn. Jan. 27, 2014) (awarding 5% as reasonable rate of return); *Nat'l Fitness Ctr., Inc. v. Atlanta Fitness*, No. 3:09-cv-133, 2013 WL 6231774, at *3 (E.D. Tenn. Dec. 2, 2013) (awarding 5% based on reasonable rate of return under market interest rates).

In contrast, prevailing market rates during the applicable time period simply do not "fully compensate" JTV for the loss of urgently needed capital, as prioritized by the Tennessee Supreme Court in *Myint*. Unlike the *Williams* plaintiff, who found alternative employment after she was wrongfully discharged, JTV could not buy another software system and, instead, continued to suffer significant harm due to Sterling's misconduct. JTV was unable to use the lost $13 million to fund its business, causing it significant financial problems. *See, e.g.*, Dkt. 901 at 50-51 (testifying that JTV had "spent all of the money for Sterling at this point of time. All that cash had already been expended."), 68 (testifying that JTV was considering bankruptcy), 102-103 (testifying that JTV did not have the tools necessary to deal with the recession because of Sterling's misconduct).[8] Sterling's tortious activities and breaches of contract left JTV without the money it spent for the failed Sterling project or the benefits promised. These factors warrant fully

---

[8] Sterling recognized JTV's financial problems in its opening and closing arguments to the jury. Dkt. 899 at 72:9-12 ("And they went to us and said, 'We want a refund,' because, short of cash, this company had to do something dramatic."); Dkt. 912 at 124 ("And that debt got so big, starting with $9 million in 2005, by the time it got to their 2008 year, they had $102 million in debt"); Dkt. 912 at 124 ("And when they got that $102 million in debt… they were in a spot. And the banks came in and said, 'You no longer can borrow money. You no longer can spend money…You now have to use every dollar and pay back the banks.'").

7

compensating JTV at the 10% rate.

Critically, unlike the cases previously cited by Sterling (Dkt. 854), the parties here agreed on the time value of money in the Universal Software License Agreement. Sterling's late charges (i.e., interest) imposed on JTV for any non or late payment of Sterling's invoices was "one and one-half percent (1½%) per month"—which amounts to 18% per year—"or the maximum amount allowed by law, whichever is less." Dkt. 55-1 at 3. Thus, the statutory maximum amount of 10% would be a proper rate of interest based on the parties' prior agreement. *Cf.* Tenn. Code Ann. § 47-14-123 (deferring to rates set by parties in a contract).

As to the equitable benefit that Sterling received from use of the funds, the Court may take judicial notice of IBM's return on invested capital (ROIC) during the same period in question, which was well in excess of 10%. *See* Ex. A, a true and correct copy of Int'l Bus. Mach. Corp., Current Report (Form 8-K) Ex. 99.1 at 8 (Mar. 8, 2018) (noting IBM had a 17% return on invested capital in 2017); *see also* Ex. B to Ex. H, true and correct copies of Bloomberg Terminal screens reflecting IBM's ROIC as follows: 23.6% for the year ending 12/31/2010 (Ex. B); 27.6% for the year ending 12/31/2011 (Ex. C); 27.5% for the year ending 12/31/2012 (Ex. D); 27.8% for the year ending 12/31/2013 (Ex. E); 27.5% for the year ending 12/31/2014 (Ex. F); 24.9% for the year ending 12/31/2015 (Ex. G); and 22.6% for the year ending 12/31/2016 (Ex. H). So it certainly is not inequitable to the Defendant for JTV to receive 10%.

Here, instead of relying on a market interest rate, the Court should award JTV 10% prejudgment interest. Indeed, the most recent Tennessee appellate opinion on this matter underscores the propriety of a 10% award. The *Coffey* opinion, written by Judge John McClarty and joined by Judges Swiney and Frierson, held that equitable factors merited a 10% award even

8

though a 23-year delay had passed between the tort and the judgment, and without any discussion whatsoever of the underlying interest rates during the period in question. 2020 WL 6277433, at *14. The Tennessee Court of Appeals affirmed Senior Judge Robert Davies' discretion in awarding the maximum 10% interest award for the 23-year period. *Id.* The trial court's decision to award 10% prejudgment interest was based on the equities inherent in the finding that the defendant breached his fiduciary duty and committed conversion of $522,000. *Id.* In endorsing prejudgment interest of 2 1/3 times the judgment, the court's analysis shows the importance of the underlying circumstances. *Id.* The same equities apply here and warrant an award of 10%.

## II. <u>THE RECORD AND CASE LAW SUPPORTS AN EQUITABLE AWARD OF 10%</u>

### A. **Equity Supports the Maximum Award of 10%.**

Equity strongly supports awarding prejudgment interest at 10%. The jury determined that Sterling's fraud, negligent misrepresentations, and breaches of contract resulted in JTV's losses of both the projected $53 million benefit from the failed project and the amount JTV spent on the failed project. The jury awarded JTV $13 million in *reliance damages* for breaches of contract.[9] The jury also awarded JTV $13 million in *benefit-of-the bargain damages* resulting from Sterling's fraudulent inducement and $13 million in *benefit-of-the bargain* damages resulting from Sterling's negligent misrepresentation. <u>Dkt. 814</u>. The jury rejected Sterling's affirmative defenses, including waiver, estoppel, and prevention of performance. <u>Dkt. 814</u>. JTV was required to elect only one

---

[9] At trial, JTV's expert, Scott Bayley, summarized JTV's damages/losses from Sterling's torts and breaches of contract into five categories: (1) $7,103,076 in cash paid by JTV to Sterling and other vendors for the procurement and installation of the Sterling software; (2) $2,993,865 in internal labor costs to plan and implement the Sterling project; (3) $3,716,844 in internal labor costs to address problems created by Sterling's software; (4) $15,856,749 in losses caused by the failure of the Sterling project; and (5) $26,936,384 in losses caused by the delay of other projects that relied on the Sterling software. <u>Dkt. 908</u> at 35-36. Significantly, JTV's damage amounts were undisputed by any witness produced by Sterling, and Sterling offered no expert witness in opposition.

of the three verdicts, resulting in $13 million in damages.[10]  Yet, JTV lost *both* the promised

benefits and its reliance damages, and Sterling has had the benefit of those funds to the Plaintiff's

exclusion.  Under Tennessee law, these facts support this Court exercising its discretion and

awarding prejudgment interest at a rate of 10% on an equitable basis in order to fully compensate

JTV for its loss.

Significantly, from the opening statement to the closing argument, Sterling acknowledged,

and indeed argued, that in late 2008 (after Sterling had been paid the contract amount in full for

the complete project, which by that time had failed),[11] JTV had no available cash and no credit.

*See e.g.,* Dkt. 899 at 72 ("in late 2008, JTV asked Sterling for a refund because, short of cash, this

company had to do something dramatic"); Dkt. 912 at 124 (in late 2008, JTV "no longer can

borrow money" and "has to use every dollar and pay back the banks").[12]  Sterling argued to the

jury that this financial condition was the reason the project was not completed, but the jury rejected

that argument and placed the reasons for the project's failure on Sterling's misconduct, finding for

JTV on its claims, and against Sterling on its affirmative defenses, including prevention of

performance.  Dkt. 814.

---

[10] On appeal, the Sixth Circuit acknowledged that it was "not entirely clear whether the jury wanted to award $39 million … or $13 million." *Am's Collectibles Network, Inc. v. Sterling Commerce (Am.), Inc.*, 767 F. App'x 584, 586 (6th Cir. 2019) [hereinafter *Sterling I*].  Relying on the "great weight" afforded to the trial court's interpretation of a verdict form under Tennessee law, and noting that neither party sought a new trial, the Sixth Circuit, in a split decision, deferred to the district court's decision to reduce the jury's total award to $13 million. *Id.* at 586-87. JTV is not complaining about this judicial determination, which is now final, but it is part of the equities that must examined.

[11] By October 2008, Sterling was providing to JTV proposed change orders in an effort to obtain a contract commitment to relieve Sterling of its obligations to complete the implementation of the Sterling software under the existing contract or for JTV to pay additional amounts at Sterling's customary rates to complete the project.  Dkt. 909 at 21-35; J-138; P-419.

[12] *See* Footnote 2, *supra*.  Much of the cross examination of JTV CEO Tim Matthews was an effort to emphasize JTV's dire financial circumstances. Dkt. 901 at 41-72.  Matthews' testimony articulated the deterioration in the economy and in the company's financial health between the new credit agreement in September 2008, the subsequent failure of Bear Stearns and Lehman, and in late 2008 when JTV was under "tremendous pressure" for "cash" and "liquidity."  The company board meeting minutes during late 2008, discussed at trial by Matthews, likewise confirm this and provide the details.  *See, e.g.,* D-37; D-40; D-47.

10

While JTV's dire financial condition in late 2008 was undisputed, JTV pointed out that it had fully paid the contract price to Sterling for the project and that the project failed because of Sterling's misconduct as expressly found by the jury. Dkt. 814. Also importantly, in late 2008, Sterling's executives, in internal correspondence, discussed using JTV's declining business and financial condition and its "desperate" need for the Sterling software "to help [JTV's] business survive" to leverage JTV. P-1029; J-179.

Thus, equity in this matter underscores an award of 10%, as permitted under Tennessee statute and case precedent, to fully compensate JTV for its losses.

**B. The *Scholz* and *Poole* Factors Support an Award of 10%.**

Significantly, both this Court and the Sixth Circuit have already applied the equitable considerations and determined that the equities weigh in favor of prejudgment interest. Specifically, in *Sterling II*, the Sixth Circuit held:

> The district court did not abuse its discretion in awarding prejudgment interest. "Fairness will, in almost all cases, require that a successful plaintiff be fully compensated . . . for all losses . . . including the loss of use of money the plaintiff should have received." *In re Estate of Ladd*, 247 S.W.3d 628, 646 (Tenn. Ct. App. 2007) (quoting *Scholz*, 40 S.W.3d at 83). Here, the equities weigh in favor of an award of prejudgment interest.

819 F. App'x at 400 n. 2. The *Scholz* and *Poole* equitable factors similarly support an equitable rate of 10%.

The *Scholz* Factors. The three factors identified under *Scholz*, *supra* that may preclude a prejudgment interest award have no application here:

1. *JTV was not inexcusably dilatory in pursuing its claim*. In fact, the opposite is true. Plaintiff filed its detailed Complaint (Dkt. 1, 4/3/2009) within days after receipt of Sterling's March 25, 2009 letter denying any relief for the failed project (Dkt. 531 at 14-15; Dkt. 531-3; Dkt. 531-4; J-178 (also marked as Wagner Dep. Ex. 14); Dkt. 909 at 152:14-155:21 (C. Wagner testimony on offer of proof that JTV relied on J-178 in deciding

11

to file suit against Sterling)).  JTV aggressively pursued its claim for 8½ years to judgment and beyond.

2. *JTV did not unreasonably delay these proceedings after suit was filed*.  This has already been decided in JTV's favor, through the district court's analysis, and the Sixth Circuit affirmed on appeal holding that "the equities weigh in favor of an award of prejudgment interest."  *Sterling II*, 819 F. App'x at 400 n. 2.  Also, as discussed *infra*, JTV aggressively pursued such proceedings.  This court expressly observed, after the senior district judge's recusal, the extraordinary efforts of JTV to get to trial.

3. *JTV was not otherwise compensated for the lost time value of its money.*  Neither Sterling nor the courts have ever suggested that JTV has already been compensated.  Likewise, the jury charge specified, and the jury verdict was clear, that interest was not included in the jury award.  The Sixth Circuit recognized that, "[i]t is not entirely clear whether the jury wanted to award $39 million (awards added together) or $13 million," acknowledging the possibility that JTV has been *under*compensated.  *Sterling I*, 767 F. App'x at 586.  But the judgment is only a single $13 million award.

The *Poole* Factors.  Also, the factors identified in *Poole*, *supra*, support an equitable award

of 10% in order to fully compensate JTV for the loss of use of its funds:

1. *JTV was prompt in the commencement of its claim.  See Poole*, 337 S.W.3d at 791; *see also* discussion of *Scholz* factor 1 *infra*.

2. *JTV did not unreasonably delay the proceedings.  See Poole*, 337 S.W.3d at 791; *see also* discussion of *Scholz* factor 2 and of the 8½-year period between filing and judgment further discussed *infra*.

3. *JTV engaged in no abusive litigation practices.  See Poole*, 337 S.W.3d at 791.  Tellingly, Sterling did not request relief associated with any abusive litigation practices.

4. *Although Sterling disputed liability, existence of underlying obligations to refrain from fraud, negligent misrepresentation, and breaches of contract are well established. Likewise, JTV's damages were ascertainable under standard methods of valuation. This fully satisfies the Poole listed factors under (4) and (4) [sic], as specifically discussed in Myint.  See Poole*, 337 S.W.3d at 791; *Myint*, 970 S.W.2d at 927-29; Dkt. 908 at 35-36; P-1458, Schedules.  Actually, the *Myint* court observed that these factors do not involve "principles of equity," and they were restated and downgraded in importance.  970 S.W.2d at 927-28.  In any event, the *Myint* standard for these two factors is fully met, and, as in *Myint*, they provide no basis to reduce the 10% rate.  Moreover, here, unlike *Myint*, Sterling failed to even present any expert testimony countering either the basis or amount of JTV's damages.  To the extent these factors are not already resolved in Plaintiff's favor, they support the 10% prejudgment interest rate, as in *Myint*. Notably, Sterling failed to present

12

any expert testimony countering either the basis or amount of JTV's damages. These factors support the 10% prejudgment interest rate.

5. *JTV has not received any prior compensation for the lost time value of Plaintiff's money. See Poole*, 337 S.W.3d at 791; *see also* discussion of *Scholz* factor 3 *supra*.

## III. THE 8½ YEAR PERIOD BETWEEN FILING AND TRIAL DOES NOT WARRANT A REDUCTION OF THE 10% RATE

In a chart included with its brief in *Sterling II*, Sterling attributed most of the 8½-year period to delays by either the district court or JTV. Dkt. 934-1. Predictably, Sterling accepts no responsibility for any delay. Respectfully, Sterling's chart is demonstrably wrong.

This highly complex case was about Sterling's replacement of legacy systems that ran virtually all of JTV's operations, and upon which JTV was totally dependent. Ten years of JTV's business and financial operations were the subject of extensive discovery. Sterling propounded five sets of document production requests consisting of 224 numbered requests (excluding subparts), and JTV produced over 2½ million pages of documents. Depositions were taken over many years, constituting 37 days with 994 exhibits. JTV and Sterling each originally listed over 1,500 trial exhibits. Between filing and trial, there were 731 docket entries.

The time involved in this case reflects hard-fought, complex litigation—not any "extraordinary" court or other delays that change the fairness analysis to the parties. Throughout the eleven plus years of this lawsuit, JTV has been without the Sterling software promised to provide $53 million in benefit to JTV (P-196) or the $13 million judgment amount including over $10 million in out-of-pocket costs JTV spent in support of the Sterling system before the suit was filed. During the same period, Sterling retained the use and benefit of this capital in its own business, receiving a return on invested capital well in excess of 10%. A reduction of prejudgment interest in these circumstances would result in an inequitable determination.

13

**A. The Court Did Not Cause Unreasonable or Extraordinary Delays.**

No delay by the senior district judge was unreasonable or extraordinary such that a 10% prejudgment interest rate is not proper or equitable. Relying on *Wilder v. Tenn. Farmers Mut. Ins. Co.*, 912 S.W.2d 722, 727 (Tenn. Ct. App. 1995) and *Varner Constr. Co. v. Marrs*, No. W2000-01029-COA-R3-CV, 2002 WL 818234 at *14 (Tenn. Ct. App. Apr. 18, 2002), the Sixth Circuit ruled that the district court's "determination that it 'd[id] not have the flexibility to discount a prejudgment-interest award due to its own delays' was erroneous." *Sterling II*, 819 F. App'x at 404. The appellate court stated: "On remand, if the district court concludes that the court caused delays were of an unusual or extraordinary nature, it should take into account the court-caused delay in determining an equitable prejudgment interest rate." *Id.* The Sixth Circuit therefore required this Court to consider only court caused delays "of an unusual or extraordinary nature." *Id.* The Sixth Circuit did not suggest that any court-caused delay here was actually "unusual or extraordinary" or that any delay affected the equities. Rather, it simply corrected the misperception that the Court *could not* "take court-caused delay into account." *Id.* at 403. And it emphasized that delay "must be assessed in the context of the parties' ongoing" litigation activity. *Id.* at 404.

In fact, the Sixth Circuit specifically noted that in *General Construction Contractors Association, Inc., v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 526 (Tenn. Ct. App. 2002), the Tennessee Court of Appeals "found no abuse of discretion where the trial court declined to reduce an award of prejudgment interest for periods of a court-caused delay, including a delay of two-and-a-half years" while the case was under advisement. *Sterling II*, 819 F. App'x at 403. The *Gen. Constr.* court said:

> The delay complained of by Appellant was not caused by any action of the
> Appellee, nor for that matter any action of the Appellant. While it may seem unjust

14

> to Appellant that the meter continued to run on the accrual of interest during the time that the trial court held the case under advisement, it could be viewed as equally unjust to the Appellee to discount this time in computing the total amount of damages due. The trial court was required to "decide whether the award of prejudgment interest [was] fair, given the particular circumstances of the case." *Myint*, 970 S.W.2d at 927. We do not believe that the trial courts award of prejudgment interest, to include the time the case was held under advisement, amounts to a "manifest and palpable" abuse of discretion.

107 S.W.3d at 526. *Varner* and *Wilder* likewise support no reduction of prejudgment interest. In both cases, the trial court considered the equitable factors, including trial court delays, and made equitable prejudgment interest awards. That is what JTV asks for here.

As to the specific delays Sterling has attributed to the Court (Dkt. 934-1), the full record tells a different story: Sterling complains that the Court delayed ruling on its motions to dismiss, but this is not reflected in the record. Instead, the length of time between filing and disposition of the motions to dismiss was elongated by the parties' extensive battling on the merits of the motions. Sterling's motion presented complicated legal issues, with hundreds of pages of briefing and numerous exhibits. Specifically, between filing of its first motion on July 22, 2009 (Dkt. 18; Dkt. 19) and the Court's ruling on its second motion on May 26, 2011 (Dkt. 53), the parties filed over 30 more pleadings, contesting almost every request for extension of time or for additional pleadings. This included: JTV's motion to file amended complaint and Sterling's objection thereto (Dkt. 28; Dkt. 29, 10/14/09; Dkt. 30, 11/02/09); JTV's amended complaint (Dkt. 32, 11/19/09); Sterling's second motion to dismiss (Dkt. 33, 12/7/09); joint motion for extension of time (Dkt. 24, 8/28/09); Sterling's motion for extension of time (Dkt. 37, 1/5/10); JTV's responses to the motions to dismiss (Dkt. 22 to Dkt. 23, 8/21/09; Dkt. 35 to Dkt. 36, 12/28/09; Dkt. 45, 7/26/10); Sterling's replies in support of motions to dismiss (Dkt. 26, 9/8/09; Dkt. 39, 1/15/10; Dkt. 46, 8/5/10), and JTV's motion to file additional brief and Sterling's objection thereto (Dkt. 40, 1/26/10;

15

Dkt.41, 1/26/10; Dkt. 42, 2/22/10; Dkt. 43, 2/22/10). Throughout this time period, the Court acted on motions in a reasonable period of time. *See, e.g.,* Dkt. 31, 11/18/09 (granting 10/14/09 motion); Dkt. 38, 1/6/10 (granting 1/5/10 motion). Sterling's second motion to dismiss was not actually ripe for disposition until August 5, 2010 (Dkt. 46), only about *nine months* before the Court's decision. The time taken by the Court to resolve the motion, given the extensive briefing, evidence, and complicated legal issues, is certainly not unreasonable, "unusual, or extraordinary."

The other delay Sterling attributed to the district court was between June 20, 2014, when Sterling filed its summary judgment motion (Dkt. 258 to Dkt. 262), and September 7, 2016, when the Court ruled on its motion (Dkt. 419). The record shows, however, that the parties' briefing activity throughout this time period, which is reflected in over *160* docket entries, significantly contributed to the time between filing and disposition. *See* Dkt. 259 to Dkt. 419. Indeed, the Sixth Circuit recognized that this time period "must be assessed in the context of the parties' ongoing discovery disputes and various motions to seal, and that the completion of briefing on Sterling's motion occur[ed] in October 2014," among other continuing litigation activity. *Sterling II*, 819 F. App'x at 404.

Specifically, Sterling's 60-page motion sought summary judgment on all eight of JTV's claims and included over 100 exhibits. Dkt. 258 to Dkt. 262, 6/20/14. JTV's 70-page response included an additional 100 exhibits (Dkt. 316 to Dkt. 320, 8/19/14), to which Sterling filed a 36-page reply and another 32 exhibits (Dkt. 342 to Dkt. 343, 10/2/14). Thereafter, the parties filed multiple pleadings on the merits, including motions to file documents under seal (*see, e.g.,* Dkt. 263, 6/20/2014; Dkt. 268, 7/07/2014; Dkt. 286, 8/1/2014), motions challenging confidentiality designations, (*see, e.g.,* Dkt. 274 to Dkt. 278, 7/16/14), and motions to strike JTV's affidavit and

16

response thereto (Dkt. 333 to Dkt. 341, 10/2/2014; Dkt. 344, 10/20/14).

Faced with hundreds of pages of briefing and evidence, the Court ordered mediation (Dkt. 346, 10/21/2014), which paused the litigation until the parties mediated on February 18, 2015 (Dkt. 353). Within two weeks of the mediator's report, the Court reset this matter for trial to occur on August 26, 2016. Dkt. 365, 2/2/15. For the next twelve months, the parties continued to file additional briefing on, among other topics, Sterling's summary judgment motion and objections to the filing of exhibits under seal. Dkt. 351, 11/19/14 to Dkt. 418, 5/19/16. Throughout this entire time period, the Court entered orders expediting briefing schedules, filing documents under seal, and confidentiality designations. *See, e.g.,* Dkt. 284, 7/22/14; Dkt. 302, 8/19/14; Dkt. 322, 8/28/14; Dkt. 331, 9/24/14; Dkt. 355, 2/20/15; Dkt. 364, 2/20/15; Dkt. 399, 3/3/16. At no time did Sterling ask the Court to expedite the disposition on its motion or stop the parties' filings. On February 24, 2016, the district court recognized the extensiveness of the parties' briefing in its docket entry:

> The Court is reviewing the dispositive motions. Due to the sheer magnitude of those motions, which have been complicated by volumes of sealed exhibits, the continued filings related to the motions, and the parties' rights to have full and fair expert discovery, it is evident that the current trial date is impracticable.

Dkt. 397 (resetting trial to May 9, 2017). The district judge's recusal order was entered shortly thereafter on March 14, 2016 (Dkt. 400), and, after the reassignment of this matter to this Court, the case advanced rapidly. Pursuant to a request by JTV (Dkt. 403), the Court held a status conference on May 3, 2016, and then entered a revised scheduling order setting this matter for trial on May 9, 2017. The last pleading related to the filing of exhibits under seal with regard to the dispositive motions was filed by Sterling on May 9, 2016 (Dkt. 417), and the Court ruled on outstanding motions a few months later on September 7, 2016. Dkt. 419. During the previous periods, Sterling could have moved the case forward, either through its own conduct or by a motion

with the court, but affirmatively decided not to do so. Taken as a whole, considering the complexity of the issues and the parties' extensive briefing, there was no unusual or extraordinary court-caused delay with regard to the disposition of Sterling's motion for summary judgment.

### B. JTV Did Not Cause Any Unreasonable Delays.

Moreover, nothing in JTV's litigation conduct supports reducing the 10% prejudgment interest rate. Under the Sixth Circuit's order, this Court need not consider party-caused delays. *Sterling II*, 819 F. App'x at 404. However, as to the delays Sterling blamed on JTV (Dkt. 934-1 at 31): Sterling's attribution of five months' delay to JTV for two amended complaints early in the proceeding reflects the commonplace practice of amending a complaint. (Dkt. 16; Dkt. 32). That practice is all the more ordinary when challenged by motions to dismiss and, in a complex case like this, where the Federal Rules of Civil Procedure required JTV to plead fraud with specificity, and where amended pleadings are indicated to plead matters responsive to opposing motions. There was nothing unreasonable, unusual, extraordinary, or dilatory about these filings.

Sterling points to a 14-month period between March 2, 2012 and April 30, 2013 during which discovery was extended *by agreement* because additional time was reasonably necessary for both parties to accommodate ongoing and extensive discovery requests. During that period, Sterling needed time to respond to JTV's requests, and *Sterling* propounded additional sets of requests, requiring more time for JTV as well. *See e.g.,* Dkt. 443-6; Dkt. 443-7; Dkt. 443-8. Sterling's requests included an additional 92 demands on JTV's business and operations over a decade-plus long period.

Sterling attributes 4½ months of delay to JTV's efforts to redepose two witnesses. Dkt. 229; Dkt. 245. It was certainly not unreasonable, unusual, or extraordinary to seek rediscovery of

18

a witness who was the major Sterling salesperson and who, unannounced and uninvited, visited a former JTV employee about earlier coercion by Sterling and its attorneys and Sterling's misconduct during the sales cycle, to which he did not clearly testify earlier. *See* Dkt. 230 at 4-6.

### C. Sterling's Conduct Caused Delays.

Sterling's own practices contributed to lengthy pre-trial proceedings. Sterling's protracted document production requests continued for over two years (Dkt. 443-5; Dkt. 443-6; Dkt. 443-7; Dkt. 443-8; Dkt. 443-19), but yet Sterling resisted its own discovery obligations, including depositions and the production of documents regarding similar software projects that it claimed to have successfully implemented for other companies (e.g., QVC), even though Sterling had touted those same projects to induce JTV to award it the contract. Dkt. 147 at 5-6. Sterling's refusal to produce such documents led to time-consuming motion practice. *See, e.g.*, Dkt. 146; Dkt. 147; Dkt. 165; Dkt. 174; Dkt. 181. The district court ultimately granted JTV's motion to compel, ordered the production of the documents withheld, and allowed the deposition of QVC's former CIO. Dkt. 198; *see also* Dkt. 219.

Moreover, in the fall of 2011, Sterling opposed JTV's proposal to set firm dates for expert discovery, insisting that expert disclosures should not take place until *after* the close of fact discovery and resolution of dispositive motions. Dkt. 63 at 3; Dkt. 64. JTV warned that this "would work an unnecessary delay in the setting of the case for trial" (Dkt. 63 at 4), but the district court adopted Sterling's proposal (Dkt. 65 at 3). Over four years later, the parties had yet to conduct expert discovery. Dkt. 390 at 1-5; *see also* Dkt. 392 at 1-3 (Sterling opposed expert discovery).

Sterling asserted 16 affirmative defenses to JTV's claims and seven counterclaims. Dkt. 55 at 1-3. JTV was required to analyze, develop strategies, and defend against each affirmative

defense, which heightened the complexity of the case. Yet, at the end of trial, Sterling submitted only three of these sixteen defenses—waiver, prevention of performance, and estoppel—to the jury, and the jury rightfully rejected each defense. Dkt. 814. As to Sterling's counter-claims (Dkt. 55 at 40-71), even Sterling acknowledged that additional time was necessary for JTV to investigate, respond, and address trial preparation to these counter-claims. *See*, *e.g.*, Dkt. 58; Dkt. 59; Dkt. 60. Yet, Sterling withdrew them on the last day of trial. Dkt. 912 at 21:16. The parties' conduct in this case was not atypical of a complex commercial dispute with diligent lawyers on both sides leaving no stone unturned. Nothing suggests that JTV's or the court's actions were dilatory, unreasonable, unusual, or extraordinary. Even if they were, however, Tennessee's equitable factors discussed above, plus the undisputed fact that Sterling had use of the $13 million judgment amount to the exclusion of JTV over an eight-year period, supports the 10% rate.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff requests the Court exercise its discretion and determine that a 10% prejudgment interest rate from filing of this action to judgment is equitable and fair to the parties and necessary to fully compensate Plaintiff for the lost use of the judgment amount. Plaintiff further requests prejudgment interest from April 3, 2009, the day JTV initiated this action, and ending October 5, 2017, the date the Court entered its original judgment, totaling $11,063,000.00.

Respectfully submitted this 29th day of January, 2021,

*/s/ David J. Shapiro*
David J. Shapiro (DS8639)
THE LAW OFFICES OF
DAVID J. SHAPIRO, P.C.
43 West 43rd Street, Suite 45
New York, NY 10036

*/s/ Jim Wetwiska*
Jim Wetwiska, admitted *pro hac vice*
Holli Pryor-Baze, admitted *pro hac vice*
AKIN GUMP STRAUSS HAUER & FELD LLP
1111 Louisiana Street, 44th Floor

20

212-709-8047 (Telephone)
917-210-3236 (Facsimile)
dshapiro@shapirojuris.com

Houston, Texas 77002
713-220-5899 (Telephone)
713-236-0822 (Facsimile)
jwetwiska@akingump.com
hpryorbaze@akingump.com

*/s/ W. Edward Shipe*
W. Edward Shipe, BRP #23887
BROCK SHIPE KLENK PLC.
265 Brookview Centre Way, Suite 604
Knoxville, Tennessee 37919
(865) 338-9700
eshipe@bskplc.com

*Counsel for Plaintiff America's Collectibles, Inc.,*
*d/b/a/ Jewelry Television®*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, I electronically filed the foregoing document

using the CM/ECF system of the United States District Court for the Eastern District of Tennessee.

*/s/ Edward Shipe*